I would like to address the multiple conspiracy issue and the issues related to Mr. Beard's prior conviction. I will submit on the related issue of my attempt to get sealed documents related to Robert Bell, unless of course the court has questions, I'd be happy to answer them. In this case, the government indicted Mr. Beard and Mr. Lee, who is represented by Ms. Bucher here today, with this wide-ranging conspiracy to traffic and drugs between Los Angeles and St. Louis. But really what the government's proof at trial was there were two very distinct conspiracies, Los Angeles and St. Louis, with the only connection between the two was this guy, Mr. Payne, who was not present. And Mr. Beard was clearly prejudiced by the government's variance in proof. Even viewing the evidence in the light most favorable to the prosecution, the evidence showed that Mr. Beard was involved in a single transaction on February 1st with Mr. Bell over at Mr. Payne's house, and that was it. There was no evidence whatsoever to show that. That was the 8-kilo transaction? It was, according to Mr. Bell. It was the $95,000 in moldy money? Right, but according to Mr. Bell. I mean, the only evidence that Mr. Beard was actually at that house was Mr. Bell's testimony that he said when Mr. Gonzalez came that he told him to go and get the stuff out of the trunk. Well, for purposes of examining the multiple versus single conspiracy, we have to take the evidence in the light most favorable to the government, do we not? Yes, and I said that. But again, the evidence in the light most favorable to the government shows that Mr. Beard was involved in a drug transaction involving Mr. Bell, Mr. Payne, and this guy Gonzalez. There's absolutely no evidence presented that Mr. Beard or even Mr. Bell or this guy Gonzalez had any knowledge that Mr. Payne was involved in this huge drug trafficking operation with anybody from St. Louis. There's no evidence whatsoever, none of the wiretaps, none of the observations of the officers, Mr. Bell's own testimony, even according to him, the government's favor that he's actually telling the truth. There's still, even he doesn't say anything about St. Louis, there's absolutely nothing to connect Mr. Beard with the St. Louis operation or even knowledge of it. And this Court has repeated time and again that in a multiple conspiracy, the evidence has to show that each defendant knew or had reason to know that his benefits were probably dependent upon the success of the entire operation. But the law also says that he doesn't have to know the identities of all of the co-conspirators, right? That's true, but... He doesn't need to know where they're located. Well, at some point you have to draw the line. I'm sorry? What were the amounts of drugs involved here? Well, according to Mr. Bell, there was, I think it was, was it eight kilos of cocaine on that particular day, and that's it. You know, Bell... Well, the jury heard evidence of more than that. I mean, they heard evidence about secret compartments in tractor trailers that could hold up to 100 kilos, and they heard 100 plus quantity pounds of marijuana, and there was cocaine and heroin, and I mean, this was quite an extensive drug trafficking business. And that is precisely why Mr. Beard was prejudiced with being indicted in this overall conspiracy, because there was no evidence that Mr. Beard had any knowledge of secret compartments, of anybody from St. Louis, from these multiple... But does he have to know all that? I mean, counsel, I'm looking at excerpt of record 47. I assume this was a chart the government prepared to illustrate their arguments to the jury. Is that where we got this? I doubt that the defense prepared it. Well, I mean, that's what I'm saying. We have to draw the line somewhere, and just because... First, let's establish what 47 is. Can you help me with that? The... The spoken wheel... Right, well, that was... What is it? That, I believe, was Mr. Bell's... Excuse me, Mr. Beard's own attorney that produced this thing, and the only connection... Mr. Beard prepared this? I believe so, Your Honor, yeah. And how did it help Mr. Beard? Because it shows only that Mr. Beard was involved with Mr. Bell, and the spokes here was all connected by Mr. Payne, of which Mr. Beard had no knowledge. And that's precisely why Mr. Beard was prejudiced by this. I'm having a hard time following your argument, because I don't see Mr. Bell's name at all. I see Mr. Payne in the middle, and then it appears that there are individuals, including Mr. Beard and Mr. Sims, who presumably are mid-level distributors, and then they have people underneath them. Is that what these charts show? Well, that's the initial with the indictment, but the government's proof at trial did not show that there was any connection between Mr. Beard and Mr. Sims, or Mr. Beard and anybody involved in this thing. I guess the question we're wrestling with is, if Mr. Beard is dealing in quantities as large as 8 kilos in one transaction in February, that is a substantial amount of cocaine, and if he is obtaining quantities in that amount from Mr. Payne, presumably the jury heard testimony that Mr. Sims was also obtaining large quantities from that same source, right? And so if the proof came out that these guys are basically then redistributing the drugs, whether Beard is in Los Angeles and Sims is in St. Louis, what difference does it make from a multiple versus a single conspiracy question if it's one large enterprise that's distributing drugs all over the country? Well, the evidence, according to Mr. Bell, because, again, that's what the government relied on to prove Mr. Beard's involvement in any of this. According to Mr. Bell, he is the one that called this guy Gonzalez to bring the drugs over there, not Mr. Beard. And, in fact, when he said that Mr. Beard's role in that whole transaction was that Bell told Mr. Beard to go out and get the stuff out of the trunk and bring it in. So it was not Mr. Beard who supplied the drugs. Well, maybe I'm not making my question very clear, but if the jury heard evidence of a drug trafficking enterprise that procured substantial quantities of drugs from common sources and then redistributed those drugs in different parts of the country, how is this any different from any other horizontal drug trafficking conspiracy where the case law says the people at the lower echelons don't need to know the identities or, as Judge Pregerson pointed out, even the locations of all the co-conspirators, as long as they know they're involved in a big drug-dealing business and everybody's making money off of it? Well, they still have to have some connection between the overall transaction, the overall conspiracy. You have to have some knowledge and you have to have agreed to participate in a large-ranging conspiracy like that. But if it was from a common source and the government's theory is that this is an integrated drug organization, what more does the government have to prove in order to sustain a single conspiracy theory? I think the government has to prove that there was more than simply a connection between Mr. Beard, Bell, and Payne. There has to be some evidence that Mr. Beard was aware that Mr. Payne's purpose and everything of the entire conspiracy was to traffic all these drugs to this large conspiracy over in St. Louis. And, again, one has to draw the line somewhere, because otherwise you could be responsible for everything that Mr. Payne was up to without having any knowledge of it. But here, unlike our usual cases where we have reversed on multiple conspiracies, involved differences in time, a conspiracy stopped at one point and then a new conspiracy started, here all of this is going on contemporaneously. And the evidence shows that this enterprise is dealing, it's kind of like the safe way of drug-dealing. You can get whatever you want, just go down aisle three. Walmart. Yeah, okay, Walmart, all right. Yeah, Walmart. So, I'm having a hard time squaring the argument that you're making with the case law and the facts. Well, again, I think taking the same case law of Duran and the Castaneda and even Kodiakos, I mean, in Kodiakos you have one individual who's connected to everybody else, but nobody else is connected except to him. And that's essentially the same thing here. We have Mr. Payne being in the center and everybody else is spread out to him without Mr. Beard or even Mr. Bell having any knowledge of how far-ranging it is. And I think that's where you stop. Where does the government stop? Can the government then show that anything that Payne or any of these other people were involved in, Mr. Beard should be held responsible for that? And I think that that's the issue. Suppose that the facts were that the drugs were obtained from a source in Colombia and that the Colombian source had lower-level people in various parts of the United States where the drugs were delivered to and then redistributed through other drug dealers. Would you argue in that case that there was more than one conspiracy or couldn't the jury properly conclude that? Well, I think you could because, for one thing, we are talking about cocaine, which typically, I mean, where is cocaine coming from? It's certainly, you know, most of the time from the way it's manufactured, it's coming from somewhere outside of the United States. That a person who's involved in one transaction for delivery of cocaine could be responsible for every drug because they're all connected to each other. The supplier in Colombia or in Mexico or Afghanistan or something like that is like feeding it out and then pretty soon everybody's connected to everybody else and you're responsible for every drug conspiracy in the entire universe. I mean, obviously, that's what I'm saying. You have to draw the line somewhere. And the government never showed that Mr. Beard or Bell had any knowledge of where these drugs were going to be distributed in this wide-ranging... And it's a question of how... Because the government controls how an indictment is planned, who's indicted, and they offer proof. And I think that's the... Didn't they name, or initially they named like 40 defendants? There were an awful lot of defendants. And the other thing, too, but this is a case where the big fish went after the little fish. Well, they flipped the big fish who got less time than the people who went to trial, right? Well, and were also much more involved, I mean, even by their own admission. I mean, Bell was a self-described drug trafficker for many years. This guy, Sims, had spent half of his life in prison for murder, gets out, starts his drug dealing. He's the main guy. He took the race to the prosecutor's office, and your client chose not to cooperate. So, I mean, we hear those kinds of complaints all the time. Right, but it's not even just a question of failing to cooperate. I mean, even according to the government's own evidence, the government's own theory of the case, Mr. Beard was a small fry. Compared to Bell, yeah, all right. Well, compared to anybody else in this case. Well, a small fry at eight keys. I'm having a hard time. Maybe a middle fry. How's that? Well, a small fry on one thing. I mean, what's the quantity? But which gets me into the, which I would really very much like to address, the sentence that Mr. Beard got, because I have raised two issues related. Wasn't Kodiakus a wheel conspiracy? That's what Kodiakus was. Kodiakus was the guy that, it was bank fraud or something. What? Kodiakus was just one guy connected to the guy in the middle, which is essentially what Mr. Beard was. In other words, there was a wheel conspiracy there, right? And doesn't the government have to show who was at the center of the wheel, and the spokes go out, and then you have to show the rim, right? So a lot depends on what kind of a diagram you produce. Well, you'd have to show some kind of connection between the spoke and the rim, and that wasn't done. And the diagram that was produced by the attorney, I think, is... Michael Tiger, a professor down there in the University of Texas. So he produced some plays shown at an ABA conference, and I had sent Tiger away at one time in handcuffs, you know, which he liked because it made him a hero at UCLA, see? And so I got to know him well. He's a nice guy, and I helped his career along that way. But he did this play, and the whole purpose of the play was to show that the conspiracy theory was developed by the British to hold down the Irish. Did you know that? I would not be surprised. And given that Mr. Beard was not Irish, I think we should be... No, but California doesn't have conspiracy theories on which to convict people, and I don't know of any other state that does. It's only in the federal system. I think there are conspiracies if you see them everywhere, I mean, and that's with the government. The question is, you know, who's involved with who? The state court system, I don't believe, has conspiracy theories. It does. It does? Yes. Where? The state of California prosecutes for people for conspiracy all the time. Put them on music? Drug conspiracies as well, murder conspiracies. Conspiracy is everywhere. There's probably a conspiracy in this courtroom, but, you know. But yes, no, conspiracy is a method that ensnares everybody. Well, you know, I presided over, oh, at least a thousand criminal matters when I was on the Superior Court. I never remember a conspiracy case. The first time I heard about it was on the federal court, and I know other former Superior Court judges that had never, they were surprised. They were aghast when you think of the reaches of conspiracy, but after a while you get used to it, see. And a lot depends on who does the diagramming. And the one cure for it, or one helpful thing, is you shouldn't have 40 people involved in one case. And the other is that the government should put on at least a prima facie case showing the existence of the conspiracy. But what they do is they say, oh, we'll tie it up later, and then that doesn't happen all the time. So I'm just talking about this. Okay, counsel, Judge Gould, if I could interject one question here. I want to let you know what's bothering me about your client's case. Okay. Yes. Eight kilos of cocaine. He sells them to pain, right? There's evidence he does. Well, again, according to Mr. Bell. Is that evidence? We're talking about the evidence, the evidence. Yes, no, I understand. Yes. From my point of this, a man sells eight kilos of cocaine to another man. Doesn't he have to know that that cocaine will be resold to others and distributed somewhere? I'm assuming, of course, that eight kilos is not going to be for personal use, that someone's going to sell that to other people, of course, and it's going to get divided along the line. What's the total value of those eight kilos? I'm sorry? What's the total value of the eight kilos? A lot. Tell me. Well, you know, Your Honor, I'm not an expert on the price of drugs these days. According to the evidence, there was $95,000 in rotting cash that was provided. That's wholesale, right? I think what Judge Ferguson is, what's the street value of eight kilos? The street value would be quite a bit more. There's no question about that. What would that be? You know, I couldn't say, Your Honor. I couldn't say. But I would say that the state courts have taken its cue from the federal courts regarding conspiracy and vice versa, and, you know, so it's everywhere. But I would like to address, if I might have a chance, very briefly the issue regarding Mr. Beard's sentence and the prior convictions that were alleged. There were two issues respecting the felon in possession charge and his actual mandatory minimum. The indictment in this particular case alleged that Mr. Beard had been convicted of 11351 health and safety code, which was a charge he had never been charged with or convicted of at any time. Well, the stipulation, though, was that he'd just been convicted of a felony, right? That's correct. Without specifying what the felony was. That is correct, but for an attorney to stipulate something like that, because the government had it, you know, the issue of the felon in possession was a bifurcated trial, and the lawyer had first asked to have that stricken from the indictment as surplusage and then stipulated to that. But if it had gone to trial as the indictment was, the government would have lost because they would not have been able to prove that he had ever been convicted of a crime like that. And translating that over into the sentence, once the government realized, initially the government objected to defense counsel's move to strike this as surplusage, but once they realized that they had made a mistake rather than seeking a superseding indictment, they just relied on the fact that his lawyer didn't appear to know what he was doing. But then when we get over into the sentence, the government... Well, I'm just trying to think what the harm is here, because there is no dispute that he had previously been convicted of a felony, and the charge was felon in possession of a firearm. So even if there was an error in the citation to the Health and Safety Code statutory section, ultimately at the end of the day, the charge is well laid, is it not? But there is harm there, because the government... If it were just simply a matter of a felony charge, then the government could have alleged that he had been convicted of any kind of a felony, even if it wasn't true, you know, murder or something like that. But we know that it was true. I'm trying to understand where the prejudice arises here. At a trial for felon in possession of a firearm, you're right, had there been no stipulation, the government would have been entitled to try to plead up, by court conviction records, what he was actually convicted of. But apparently as a result of the stipulation, they didn't have to do that, because counsel stipulated that there had been a prior conviction for a felony, presumably because he didn't want to get into the details of what Mr. Beard had previously been convicted of, because it's too prejudicial. But the government would have had to prove what they charged in the indictment. No question about it. But they didn't do it, they didn't have to do it, because... Are you making an IAC claim here? Yes, I am. Is that what this is, on direct claim? Yes, I am. Well, why is it ineffective for a good defense lawyer to want to keep from the jury the sordid details of the prior felony conviction when he's now defending a subsequent charge of felon in possession of a firearm? Because he stipulated to a charge that the government could not prove. The government could not prove that he had been convicted. The stipulation was that he was previously convicted of a felony. That's it. But why make that kind of a stipulation if the government has to prove that you were convicted of 11351 and you were not? Well, because the government can prove that he was previously convicted of a felony. It's just a different felony than the one... I mean, he might have won, you're right, but... Well, I mean, that's the issue. If we decide there was a reasonable strategic basis for stipulating to an unspecified felony, I'm still having a hard time deciding under the second prong of Strickland. Even if you establish the first prong, where's the prejudice? Well, the prejudice is because he would not have been convicted because the government would not have been able to prove the felony that they charged. And we're getting into the felony that they claim he was convicted of, which was the 11350, simple felony possession, into when they filed the information for the mandatory minimum. Again, the statute requires that the government prove that that conviction was final, and the government did not do that. And the defense attorney did not object to the fact that it wasn't final. The government's proof consisted solely of a minute order for a plea and no judgment, no minute order for the sentencing. We don't know what happened to that case. And that's the type of case, 11350, which could have been dismissed. That was so many years ago. And the fact that the defense attorney did not object to that fact, that also goes into why did he stipulate to the proof of a felony conviction when we could never show that the other one was final. But I will say this. I understand that ineffective assistance of counsel claims are normally raised in a 2255. I think the evidence does show that the defense attorney could not have had a rational, tactical decision in whatever he had done in this case. But... Well, if you want to rely on the record as it exists, though, because he didn't produce any evidence that the conviction was not final, then the only thing we have to assess is the record that is before us. And I think there was a reasonable, tactical basis to make the stipulation. And then I'm left with documents that show he was, in fact, convicted of a felony. So if you really want us to decide on direct appeal, the IAC claim, you might be better off waiting to challenge it on Habeas. That was my next comment. I was going to ask the court. If the court feels that there's something missing, I would ask... I mean, either you offer it or you don't. We're not going to tell you what the answer is. No, no, no. I understand. I'm thinking hypothetically. Okay. All right. Of course. If the court were to feel that this claim of ineffective assistance of counsel as related to both the felon in possession charge and the sentence is that there's something missing here and we can't do that, then I would ask the court to deny those claims without prejudice. And if we need to file a 2255, we'll make it good at that time. I understand your point. Yes, thank you. Okay. And if you have no more questions, I'll save whatever time I have for rebuttal. Thank you. Thank you, Ms. Wessel. Good morning, Your Honors. I'm Karen Buchert for Mr. Duman Lee. Getting back to the drug conspiracy and the diagram idea, Mr. Payne is in the center of the diagram. And on one side is the Los Angeles conspiracy dealing with Bell, Beard, and Payne. And on the other side is the St. Louis conspiracy. And the only common link between the two conspiracies is Mr. Payne. Ms. Buchert, are you now embracing Mr. Beard's lawyer's diagram or should I look at the government's diagram? I haven't seen that diagram. I have a diagram of the government's theory. The government's theory is the one that shows the distribution in both Los Angeles and St. Louis. Right, but they put Sims as the middle. And our argument is Mr. Payne was in the center. In fact, he was the focus of the investigation from day one. He was the main person. And he was involved with two conspiracies. And the argument is simply just because Mr. Lee was in one conspiracy and Mr. Payne was connected to two, everyone on the St. Louis conspiracy cannot be responsible. Well, the problem we have with Mr. Lee is under the chart that I was thinking of that shows St. Louis on one side and Los Angeles on the other, he's the transporter. I mean, he's transporting drugs from Los Angeles to St. Louis in his tractor trailer that has a hidden compartment to hide up to 100 kilos of coke. He never did that, Your Honor. I understand that, but it was constructed for that purpose if I accept the government's testimony in the light most favorable to the verdict. And then under the evidence that the jury heard, he carried cash back from the proceeds of the sale of those drugs to the organization in Los Angeles. So it's a harder argument for Mr. Lee to make than it is for Mr. Beard given his role in the enterprise, isn't it? Well, yes, Mr. Lee's, the scope of his understanding of the agreement was the conspiracy was limited to Sims and Corral. And the drugs would come from them. Then he would simply take them back to St. Louis. He had no clue, no idea about this separate Los Angeles conspiracy that was going on at the same time. That's how it was pled. So the only connection is pain, and Beard and Bell shouldn't be responsible for the St. Louis conspiracy because they have no clue that's going on with pain and vice versa. Mr. Lee cannot be responsible for anything. He has no idea. Going back to the discussion that I was having with Ms. Wethald, if I view this as almost a layered or tiered conspiracy, you've got a source of supply in Los Angeles, and then you have tentacles that reach out into different communities where the wholesale quantities are then redistributed to street-level dealers in smaller amounts. And Mr. Lee's role in this particular enterprise was the transportation of drugs in one direction and money in the other. And I'm having a hard time trying to understand why he is in a stronger position than Mr. Beard to make the argument of multiple versus single. I don't think he's in a stronger position. I think they're in the same position because there are two separate conspiracies going on. One distinguishing factor is that Beard never visited St. Louis. According to Ms. Wethald, he had no idea who the people were there, whereas Mr. Lee is certainly knowledgeable of who's doing business in St. Louis because he's carrying the drugs and picking up the money. I agree with that, Your Honor. But my point is that the way that this case was fled, there was a Los Angeles conspiracy with Payne, Beard, and Bell, and that was something separate. The February 5th drug transaction shows that. Then on the other side, we have the St. Louis conspiracy, which is much larger and much broader. But the two conspiracies did not know of each other, and the problem is they were pled together. I think that's the point. But if everybody's obtaining the drugs from the same source and the money is going back to that same source, why is that two conspiracies? That's the problem I'm having with this argument. I could understand if it involved different time periods, if there were different quantity, not quantities, but types of drugs involved, completely different people. But the government's theory, as I understand it, and what the jury heard was a large drug distribution enterprise that funneled its drugs to different parts of the country. And I'm trying to understand why that isn't just one single drug trafficking conspiracy. Because there's a point where the funneling or the tentacles have to be cut somewhere. Not everyone's going to be responsible for everything around the United States. What was in Mr. Lee's mind? What was the scope of the conspiracy? When you're constructing a compartment to carry the quantities of drugs that we're talking about, it's not a very sympathetic argument. If Mr. Lee had been some low-level street distributor in St. Louis, I think you'd have a much stronger argument than a guy who has a specially constructed smuggling vehicle in order to move large quantities of drugs and cash. Well, there's another case I have in mind that might explain my position better. It's U.S. versus Fernandez. That was the Mexican Mafia case. In that case, the appellants had argued there was a bunch of sub-agreements, little conspiracies. And the court found, yes, there was little conspiracies, but they were taxing street gangs and they were selling drugs. And it was coordinated that no one was selling drugs at the same place. And they had the protection of the Mexican Mafia. So they were under the umbrella of the Mexican Mafia, which made it a single conspiracy. A kind of a market allocation scheme. Yes, but we put it under the same umbrella, under the Mexican Mafia conspiracy. Another good case is U.S. versus Hopper. And the role of the Mexican Mafia in Fernandez, as I recall it, was basically to provide protection and to sort of police the market allocation to make sure that nobody who belonged to the enterprise intruded on somebody else's sales territory. That's right, and that's what made it a single conspiracy. That's how it's different in our case. There's no umbrella, no group, big group over all the conspiracies. They were separate. And Fernandez, what tied all the little groups together was the Mexican Mafia as a whole. I guess I'm still having a hard time. If the source of supply and the funneling of the drugs and the money is coming and going from the same place, why can't we just see that as sort of a distribution division of the enterprise? But it wasn't coming from the same place. It came mainly from Corral. Daniel Corral, who was a cooperating witness, he was the one that supplied almost all the drugs that went to St. Louis. This instance with Payne, I think, happened once or twice. Corral, in Mr. Lee's mind, it was Mr. Sims and Mr. Corral that were supplying the money. He had no idea the money was coming from another source. It's the way that it was played. They combined two conspiracies into one. And as the evidence came out, it turned out to be two separate conspiracies. I'd like to talk a little bit about the motion to substitute counsel. Even though my client didn't have a hostile relationship with his attorney, their communication broke down to the point where there was a complete breakdown because Mr. Lee maintains his innocence and he wanted to talk about the case. He wanted to know what the government's evidence was, what the defenses were, and just talk about trial strategy. Whereas the attorney just wanted him to plead guilty. The government wanted him to testify against Oscar Dillon. And my client didn't want to do that because he had never heard of Oscar Dillon. He couldn't testify against someone he had no knowledge of. And so he didn't want to plead guilty. He wanted to move forward on this trial. And they couldn't speak. There was like a brick wall between them. The attorney wanted to just plead the case out. The client wanted to talk about the case. They wanted to discuss trial strategy. And that never happened. That kind of communication never happened between counsel and the client. And that is where the court abused its discretion in not allowing him to get an attorney that would talk to him about the case. And this case is very similar to the Aldoza-Gonzalez case where the attorney told the client that he would sink him for 105 years if he doesn't plead guilty. And they never talked about the case. So that's the distinction here, that there was a complete breakdown of communication because the case wasn't discussed. What did you do with the factual finding by the district court that there had been no irreconcilable breakdown? Well, the court said that Mr. Lee was not able to establish IAC or a total breakdown of communication. And the court was confident that the attorney can represent Mr. Lee vigorously. And that's not the focus on these type of motions. The focus is the relationship between the attorney and the counsel, not the competence of the counsel. And the record, the fact that the attorney and the client were not talking about the case, and the attorney even admitted it, he said very little was discussed about the merits of the case. And the attorney didn't dispute the fact that he wasn't talking to Mr. Lee about the merits of the case. Mr. Lee just wanted to know what the government's case was and devised a defense, and the attorney wouldn't do that. Isn't this, I'm looking at, I guess I don't have an excerpt of records, I guess it may be 26, but it's page 19 of the hearing before Judge Otero, at page 19 in which he says the court would conclude that there is not a total breakdown of communication between defendant and counsel. Isn't that a factual finding? It is a factual finding, but the point is it was a total breakdown because even the attorney admitted he was not speaking to the client about the case. In order for there to be an attorney and client relationship, you have to talk about the case. It was like a brick wall between them. So your position is that that's clearly erroneous? Absolutely, it was abuse of discretion. So we'd have to find it clearly erroneous in order to overturn it. Yes, and the facts support that. The facts show, and the attorney doesn't dispute it, they did not talk about the merits of the case. The only thing the attorney asked him was whether or not there was a search of the truck and was anything found, and that was it. Nothing else was discussed, and Mr. Lee wanted an attorney who he can talk to, think of defense as he believed he was innocent, and his attorney was not willing to do that. His attorney just wanted him to plead guilty, testify against somebody who he didn't know. And at that point, the court should have granted him a new attorney so they can at least discuss the case and the defenses. Okay. Thank you. Okay, thank you. May it please the Court, Rosalyn Wayne for the United States. This case was a classic chain-and-link conspiracy involving the distribution of drugs from one conspirator to another from Los Angeles to St. Louis. There was a core group of conspirators who remained constant throughout, and there's a chart in the government's brief for Defendant Lee at page 20. At the center of the conspiracy was Ralph Sims, who testified at trial. Sims got cocaine and other drugs from Los Angeles. He used 18-wheeler truck drivers to transport drugs to his customers in St. Louis. There were two primary suppliers, two primary transporters, and two primary groups of customers. Sometimes Sims would use one supplier at times another. Sometimes he would use one transporter at times another, but he would essentially switch off between the two. There was also a consistent period of time from 2006 to 2007, during which either the suppliers or either of the transporters were being used. Defendant Beard supplied one of the Los Angeles suppliers, Canyon Payne. Defendant Lee was one of the truck drivers who drove between L.A. and St. Louis. And although there are times when defendants can claim they were only tangential, neither of these particular defendants can say they had a tangential role in the conspiracy. As a supplier and as a transporter, both had essential roles in the conspiracy. Not every conspirator participated in every transaction, but as in Beboro, the membership remained relatively consistent. Cooperator Bell testified that he supplied Defendant Beard with cocaine from July or August 2006 to March 2007, each time between 1 and 22 kilograms of cocaine at a time. And Bell testified that Defendant Beard was getting the cocaine for Canyon Payne. And then on the other side, Cooperator Sims testified that he was getting cocaine from Payne in 2006 and 2007, which makes the time period consistent. And given that we had a specific transaction, the 8-kilogram transaction that we talked about earlier, the jury could certainly make the inference that some of the cocaine Sims was getting from Payne was ultimately coming from Bell and Beard. As Judge Gould pointed out earlier, the fact that the quantities were so big was evidence in and of itself that there was a larger conspiracy going on. Certainly, the jury could infer that, I'm sorry, certainly Defendant Beard would know that Payne was not stockpiling 1 to 2, 1 to 22 kilograms of cocaine at his house in Compton for personal use. So there was certainly enough evidence that Defendant Beard knew it was going to customers elsewhere. I want to go a little bit into the evidence since I think defense counsel would like to say that, oh, it was only the testimony of cooperators or it was only that one incident. But Sims testified that Defendant Lee started transporting money and cocaine in his truck in 2006 in that there were several transactions that defendant had transported cocaine, heroin, and marijuana for Sims in 2006 and 2007, and that Defendant Lee would then transport the money back from St. Louis in his 18-wheeler truck. There was surveillance. There was seizure evidence. With Defendant Lee, there was a stop of his truck with a secret compartment inside. There was a marijuana seizure from Jeremy Steele and testimony that Defendant Lee had transported part of the entire shipment of that marijuana to the St. Louis customers. As to Beard, there was the seizure of money from Juan Gonzalez. There were the firearms and scales seized from his repair shed. There were intercepted calls involving both defendants. There was Defendant Lee intercepted talking about the secret compartment installation, and with Defendant Beard, there was a series of intercepted calls in which Sims called Payne asking for 8 kilograms, Payne called Defendant Beard asking for 8, and then Beard called Bell asking for 8. And then we have the money seizure after the transaction that night, and then the day after the seizure, there's actually calls between Defendant Beard and Robert Bell talking about the fact that there had been a seizure of the money. So, you know, it wasn't a case where there was just a slight amount of evidence with regards to each defendant. There was actually co-operator testimony, there was intercepted calls, there was law enforcement testimony as well. As this court decided in Shabani, a conspiracy can have subgroups and subagreements as long as there's a broad project to distribute cocaine that's established. And each of the defendants knew that their benefits were dependent on the success of the operation. Defendant Lee was getting money for transportation, and Defendant Beard was obviously getting a cut for dealing cocaine. So they knew that if there was no supply going out to St. Louis, then neither of them would be able to get paid. With regards to the stipulation as to the felony for Defendant Beard on the felon possession charge, it's established in Old Chief, the Supreme Court case, that it's a sound tactical decision for a trial attorney to stipulate to a prior felony charge to avoid any prejudicial effect. And the fact that you can just stipulate to that charge and not have to prove the nature of the felony indicates that it's not an essential element of the charge to prove felon in possession. Also, the point of the indictment is to give notice of what the government intends to prove. And in this particular case, defendant can't argue that he didn't get notice of the erroneous felony, given that he did bring it up to the court and he did have the documents showing exactly which of the felonies that he had pled to. And then with regards to Defendant Lee and his substitution of counsel claim, the court did several hearings with Defendant Lee and his counsel and really did get to the heart of what was bothering Defendant Lee. And essentially, Defendant Lee said that he thought he was innocent, he thought his counsel should have filed more motions, and by not filing pretrial motions, Defendant Lee thought he was essentially conceding the fact that he was guilty. And I think it's very telling that at the final hearing between Lee, his counsel, and the court, Defendant's primary concern was, I don't think my counsel is preparing to go to trial, I don't think he has any intention of going to trial. And the court said, let me make it clear, you are going to trial on this date. And Defendant's response was simply, okay, that's fine. And the court at that point asked, is there anything else? And Defendant Lee said no. So by addressing that issue, it appears the court did find what the heart of the issue was, and I don't think there's any evidence that there was any abuse of discretion. Didn't his counsel testify that because there were 40 defendants in the case, he had received a substantial amount of discovery and he was going through it to try and see what discovery related to Lee, but that very little of it did. And so he didn't have a lot to work with in terms of knowing what the government's case against his client would be, but he joined in the defense motions nonetheless in the hope that if any of them were granted, it would benefit Mr. Lee. I didn't read the record that way. The defense counsel said that there were a lot of intercepted calls in which other co-conspirators talked about Lee, and so he found that problematic but couldn't find any real reason to file a motion to suppress, although he did try to join in other co-defendant's motions. Those statements would come in as co-conspirator statements under 801 D2E. I'm assuming he doesn't say explicitly why that's a problem, but I'm assuming yes. Wouldn't that be the government's theory of admissibility? Right, right, co-conspirator statements. And then he also said that I think he implied that because defendant was stopped with a secret compartment in the truck, obviously that would pose a problem to having a defense at trial. And the only break he got there was there was nothing incriminating in the compartment when the CHP looked at it. Right, which he obviously did argue at trial, and that was one of his defenses. If there are no questions from the court, I will submit. No questions here. Thank you. Thank you very much. Very, very briefly, in response to the government's citation of old chief, the issue is not whether a defense counsel would ever want to stipulate to something to keep facts away from the jury. The issue is whether a defense counsel would confidently stipulate to something that the government could not prove. The government could not prove the 11351, and ultimately they did not prove the 11350, and that's the issue. Thank you. Thank you. I don't recall the judge and the attorney during the motion to substitute counsel speaking about the secret compartment. The only thing that the attorney said that we spoke very little of the defenses, and the only thing that he asked Mr. Lee was, was your truck searched, and if so, was anything found, and the answer was no. That was the scope of the discussion regarding the merits of the government's case. I'm looking at Mr. Swarth's colloquy with the court on page 17, and he says, we've discussed to a very small degree. I've asked Mr. Lee a couple of questions that I haven't been able to find in the discovery. The allegation against Mr. Lee is that he's a transporter of narcotics from the Los Angeles area to the St. Louis area, and that he is a long-haul trucker, and in fact, had a compartment cut out of his rig to accommodate, a secret compartment to accommodate the narcotics. Is that what you're referring to? Well, I have ER 24. Yeah, 24. 24. Yeah, that's actually page 17 of the transcript starting at line one, and then he goes on. I've inquired of Mr. Lee about the disposition of his truck. When was there a search of his truck? What was in the truck? Was his truck seized? Was anything ever found in his truck? The answer is no, so that essentially has been what we've discussed substance. Then I had a misrecollection about the compartment. My memory was that he asked him, was your truck searched, and the answer was no, and Mr. Lee wanted to get more into the case. He only received the discovery at the end of September 2008. The attorney sent him all the discovery, and the trial was to start in November. Mr. Booker, I guess how I read that colloquy between defense counsel and the court is, look, I've looked at this stuff. I've tried to go through the discovery to see what other people are saying about my client. This is basically the government's case. I can't think of any reason to suppress, you know, this evidence. I mean, what more is a good lawyer supposed to do under these circumstances? Your Honor, it's more than just the pretrial motions. I think in Mr. Lee's viewpoint, he was not getting that dialogue between his attorney and himself. He was not understanding what was going on. All he knew in his mind that he was asked to plead out and testify against a co-defendant. There was not that dialogue of what are the strengths and what are the weaknesses. It could be that there were a lot of weaknesses, but based on the record, Mr. Lee wasn't understanding that. He was just told to plead out, testify against somebody. Well, I guess what I'm reading in that is his lawyer has considered what the defenses might be and that they're not very strong, and so wouldn't competent counsel at that point want to have a hard-to-hard talk with the client about maybe it's time to think about reducing our exposure here by cooperating and testifying? I agree with that, Your Honor. But based on what I'm reading in the record, I don't think that really happened. The way that the record is played out is that his attorney didn't talk to him about all these things in the detail that he might have told the court. He wasn't, the bottom line, Mr. Lee was not understanding the government's case.  What the strengths and weaknesses of the government's case and what the merits were, and he was not going to testify against somebody who he didn't even know. Thank you, Your Honor. Thank you. Thank you, and appreciate the argument. Well-argued on both sides, and all three sides, I should say. So we thank you for your, I like your smile. A smile gets you a long way in this world. And with that, we'll recess until tomorrow morning at 9.30. Again, good lawyering. Yeah, good lawyers. Thank you all.
judges: Pregerson, Gould, Tallman